**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| Maxell, LTD.,<br><br>                    *Plaintiff*,<br><br>v.<br><br>LG Electronics, Inc.<br><br>                    *Defendant*. | Civil Action No. [                    ]<br><br><br>**COMPLAINT AND DEMAND<br>FOR JURY TRIAL** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Maxell, Ltd. ("Maxell"), by and through its undersigned counsel, files this complaint under 35 U.S.C. § 271 for Patent Infringement against Defendant LG Electronics, Inc. ("LGE" or "Defendant") and further alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

**OVERVIEW**

1.      This is an action for patent infringement by Maxell. Founded in 1961 as Maxell Electric Industrial Co., Ltd., Maxell is a leading global manufacturer of information storage media products, including magnetic tapes, optical discs, and battery products such as lithium ion rechargeable micro batteries and alkaline dry batteries, and the company has over 50 years of experience producing industry-leading recordable media and energy products for both the consumer and the professional markets. Maxell is also a leading manufacturer of projectors and lenses and additionally sells various other devices, such as Bluetooth headsets, wireless charging solutions, etc.

1

2.      Maxell has built up an international reputation for excellence and reliability, for pioneering the power supplies and digital recordings for today's mobile and multi-media devices, and leading the electronics industry in the fields of storage media and batteries.

3.      Since being one of the first companies to develop alkaline batteries and Blu Ray camcorder discs, Maxell has always assured its customers of industry-leading product innovation and is one of the world's foremost suppliers of memory, power, audio, and video goods. Maxell's well-recognized logo and iconic "blown away" image exemplify the reputation Maxell carefully developed in these markets.



4.      As more fully described below, in 2009 Hitachi, Ltd. assigned much of its consumer product-facing intellectual property to its consumer product business division, Hitachi Consumer Electronics Co., Ltd. Then, in 2013, the consumer electronics division of Hitachi Consumer Electronics Co., Ltd. was transferred to Hitachi Maxell, Ltd. This involved assigning the intellectual property including the patents in this case, to Hitachi Maxell, Ltd. In 2017, Hitachi Maxell engaged in a reorganization and name change—to Maxell, Ltd.—in an effort to align its

2

intellectual property with the business development, research and development, and licensing efforts of Maxell, including in the mobile and mobile-media device market (Hitachi, Ltd. and Hitachi Consumer Electronics Co., Ltd. are referred to herein collectively as "Hitachi"). In October 2021, Maxell Holdings, Ltd. and Maxell, Ltd. underwent an absorption-type merger and name change. In that merger, Maxell, Ltd. was absorbed by Maxell Holdings, Ltd., including the ownership of the patents at issue in this matter and the rights to license agreements covering such patents. Maxell Holdings, Ltd. then changed its name to Maxell, Ltd. Maxell continues to own all rights to the patents-in-suit, as well as the entire Maxell portfolio initially obtained from Hitachi.

5.      Today, Maxell maintains a thriving business in the mobile device market including wireless charging solutions, wireless flash drives, multimedia players, storage devices, and headphones. Maxell also maintains intellectual property related to televisions, computer products, tablets, digital cameras, and mobile phones. As a technology developer and industry leader, and due to its historical and continuous investment in research and development, including in the State of Texas, Maxell owns a portfolio of patents related to such technologies and actively enforces its patents through licensing and/or litigation. Leading television manufacturers have recognized the value of Maxell's intellectual property and have obtained a license from Maxell in the recent past—including many of the television companies well-known to consumers.

6.      Maxell is forced to bring this action against LGE as a result of LGE's knowing and ongoing infringement of Maxell's patents as further described herein.

### LGE's Knowledge of Maxell's Patent Portfolio

7.      LGE has been aware of Maxell's patent portfolio since at least July 2021. Since then, the parties engaged in negotiations regarding that portfolio up until the filing of this complaint.

8. On July 19, 2021, Maxell sent a notice letter to LGE, inviting LGE to discuss patent licensing for TV and smartphone patents. The letter identified over 200 exemplary patents and accused LGE products—including smartphones, tablets, and TVs—of infringement. The letter specifically identified U.S. Patent Nos. 10,650,780, 9,924,124, 10,219,020, 10,321,206, 10,958,971, and 8,107,007.

9. LGE responded on August 18, 2021, and noted that it had exited the mobile phone market as of July 31, 2021, and requested claim charts to evaluate the patent portfolio.

10. On September 9, 2021, Maxell responded by emphasizing the breadth of its 6,000+ global patent portfolio and asserted that detailed technical back-and-forth was unnecessary given the portfolio's well-established market value. LGE responded on September 14–15, 2021, requesting detailed claim charts.

11. On October 20, 2021, Maxell sent a letter with a draft Non-Disclosure Agreement ("NDA"), a 2017 patent listing, and additional information. Maxell offered to provide claim charts from prior litigations under the NDA. LGE acknowledged receipt on October 26, 2021, and returned the signed NDA on November 8, 2021.

12. In late November 2021, LGE proposed a teleconference for the week of December 13, 2021, to discuss how to proceed with technical discussions. On November 12, 2021, Maxell provided claim charts for 63 patents in total as an example under the NDA for LGE's internal evaluation on Maxell's patent portfolio. On December 15, 2021, the parties held their first meeting—a video teleconference—to discuss technical matters and how to proceed with discussions.

13. On June 16, 2022, Maxell provided LGE with patent introductions and explanation materials for several representative patents, including three TV patents. On August 3, 2022, LGE

requested claim charts. Maxell responded on August 17, 2022, stating that it had already provided over 60 claim charts for its patent portfolio and urged LGE to move to business discussions rather than continuing technical back-and-forth. LGE continued requesting LGE-specific claim charts on September 8, 2022.

14. In late November 2022, Maxell proposed an in-person meeting in Seoul for December.

15. On December 9, 2022, Maxell proposed January for in-person meetings.

16. On December 21, 2022, Maxell sent a reminder about the proposed meeting dates. However, on December 22, 2022, LGE indicated that due to internal reorganization, it was difficult to schedule a meeting at that time.

17. From December 2023 through June 2025, Maxell and LGE were in litigation over Maxell's smartphone portfolio.

18. In June 2025, the parties negotiated and finalized a mobile phone patent agreement.

19. On September 8, 2025, Maxell inquired with LGE regarding their point of contact. On September 16, 2025, LGE designated points of contact for TV patent discussions. On September 19, 2025, Maxell sent a formal follow-up letter regarding TV patents, referencing the July 2021 letter and the now-concluded smartphone settlement. The letter listed 183 TV patents and invited LGE to restart negotiations regarding Maxell's TV patent portfolio. The letter specifically identified U.S. Patent No. 8,970,793.

20. In September 2025, the parties exchanged emails to schedule an in-person meeting. On October 28, 2025, Maxell representatives visited LGE's Seoul office for an in-person meeting to discuss TV patents.

21.    On November 12, 2025, LGE proposed a focused technical review process, selecting 19 representative patents from prior litigations and requesting detailed claim charts for 4 specific patents. On November 25, 2025, LGE agreed to schedule a technical discussion meeting after receiving claim charts. On November 29, 2025, Maxell sent a detailed claim chart for one of the four requested patents.

22.    On December 28, 2025, Maxell proposed a video call for January 2026.

23.    On January 14, 2026, the parties held a video call.

24.    On January 19, 2026, LGE proposed a targeted technical review of specific patents and identified 10 patents. On January 20, 2026, Maxell thanked LGE for the video call, suggested the February 24 meeting in Seoul. Maxell also proposed an attorneys-eyes-only review of LGE's claimed existing agreements with Hisense and Funai, which LGE claimed obviated a license for certain of Maxell's patents. Maxell explained that without such a review, LGE's claim of a license defense could not be confirmed. LGE noted its availability on February 24 but declined the attorneys-eyes-only review, citing confidentiality obligations with Hisense and Funai, and refused otherwise to confirm its license defense beyond mere self-serving statements. LGE indicated it would prepare a counteroffer for the Seoul meeting.

25.    On January 29, 2026, LGE sent its technical response on 10 patents agreed to between the parties. On February 20, 2026, Maxell submitted the counterarguments against the technical response to LGE.

26.    An in-person meeting occurred February 24, 2026, at LGE's Seoul office. Maxell presented a revised offer, and LGE provided a counteroffer.

27.    Maxell continued to communicate with LGE up until the filing of this complaint. Maxell had hoped that the parties could reach a mutually beneficial solution—but LGE instead

insisted on technical discussions for years and elected not to enter into an agreement with Maxell and/or license Maxell's patents for its televisions.

28.     LGE continues to make, use, sell, and offer for sale Maxell's patented technology without a license. Accordingly, Maxell now files this Complaint.

## PARTIES

29.     Plaintiff Maxell, Ltd. is a Japanese corporation with a registered place of business at 1 Koizumi, Oyamazaki, Oyamazaki-cho, Otokuni-gun, Kyoto, Japan.

30.     Defendant LG Electronics Inc. is a company under the laws of the Republic of Korea with its principal place of business at LG Twin Towers 20 Yoido-dong, Youngdungpo-gu, Seoul, South Korea.

## NATURE OF THE ACTION, JURISDICTION, AND VENUE

31.     Maxell brings this action for patent infringement under the patent laws of the United States, 35 U.S.C. § 271 *et seq*.

32.     This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States.

33.     This Court has personal jurisdiction over Defendant pursuant to due process and/or the Texas Long Arm Statute because (1) Defendant conducts business and continues to do business in Texas, (2) Defendant has committed acts of direct and indirect patent infringement in this District, the State of Texas, and elsewhere in the United States, including making, using, offering to sell, and/or selling accused products in Texas, and/or importing accused products into Texas, including by Internet sales and sales via retail and wholesale stores, inducing others to commit acts of patent infringement in Texas, and/or committing at least a portion of any other infringements

alleged herein. In addition, or in the alternative, this Court has personal jurisdiction over Defendant pursuant to Fed. R. Civ. P. 4(k)(2).

34.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b), 1391(c), and 1400(b) because (1) Defendant has done and continues to do business in this district; (2) Defendant has committed and continues to commit acts of patent infringement in this district, including making, using, offering to sell, and/or selling accused products in this district, and/or importing accused products into this district, including by internet sales and sales via retail and wholesale stores, and/or inducing others to commit acts of patent infringement in this district; and (3) Defendant is a foreign entity.

35.    Venue is proper as LGE is organized under the laws of South Korea. 28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants." *See also In re HTC Corp.,* 889 F.3d 1349 (Fed. Cir. 2018).

36.    Additionally, Maxell has had regular and continuous business in Texas since 2014. As a result of such business dealings and hopes to expand those and other business dealings, a Maxell affiliate, Maxell Research and Development America, LLC ("MRDA"), was founded in Marshall, Texas. MRDA is part of a joint venture with another business in Marshall, and the entities work together on research and development related to user-interface, connectivity, energy solutions, and other emerging areas. MRDA's ongoing projects include, for example, the research and development of all-solid-state battery, which Maxell hopes will be utilized in any digital products such as smartphones and TVs, and advanced floating image display, which in the future can be implemented at least through televisions, projectors, and tablets. In addition, the joint

venture is performing research and development on weatherproof battery packs for flashing stop signs. Maxell has regularly met and continues to regularly meet with MRDA to expand its business, and investments are being made by Maxell, MRDA, and others in this District to further the goals of these companies.

37.    Maxell has filed other lawsuits in Texas to enforce its patent portfolio, including asserting some of the currently asserted patents against Hisense Co., Ltd. et al and various TCL entities.

### COUNT 1 - INFRINGEMENT OF U.S. PATENT NO. 8,107,007

38.    Maxell incorporates paragraphs 1-37 above by reference.

39.    U.S. Patent No. 8,107,007 (the "'007 Patent," attached hereto at Exhibit 1) duly issued on January 31, 2012, and is entitled *Image Processing Apparatus.*

40.    Maxell is the owner by assignment of the '007 Patent and possesses all rights under the '007 Patent, including the exclusive right to recover for past and future infringement.

41.    The '007 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

42.    Like other validity issues, a patent is presumed eligible under 35 U.S.C. §101, and can only be found ineligible by clear and convincing evidence. The '007 Patent is patentable under 35 U.S.C. § 101. It is not directed to an abstract idea. It provides specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific unconventional components, such that it does not preempt the technological field.

43.    The claims of the '007 Patent are not directed to an abstract idea and are not limited to technology that is well-understood, routine, or conventional. Rather, the claimed inventions

include inventive components that improve upon the function and operation of preexisting image processing systems and methods.

44.    The '007 Patent is directed to an image processing apparatus, such as a television, designed to intelligently adjust the frame rate of video content being displayed. '007 Patent at 1:14-18. This apparatus fundamentally includes an input unit for an image signal with a predetermined frame rate, an information acquirer for obtaining specific details about that input signal (like the amount of motion or the genre of the program), and a frame rate converter. *Id*. at Abstract. The primary role of this unconventional converter is to modify the frame rate of the input image signal dynamically, based on the information gathered by the acquirer, before outputting the signal for display. *Id*.

45.    The development of such an apparatus builds on a long-standing understanding within image science. It has been understood for over a century, from early motion studies, that creating more frames to capture a given motion will result in a smoother visual presentation. The "frame rate" itself simply refers to the number of individual frames displayed per unit of time; for instance, a frame rate of 60 hertz (Hz) means that 60 individual frames are shown every second. The '007 Patent focuses on an unconventional arrangement of unconventional components for optimizing this aspect of video display for various content types.

46.    The '007 Patent explains that conventional methods of frame rate up-conversion, while capable of making moving pictures appear smoother, are not without significant drawbacks. '007 Patent at 1:24-40. A key issue is that such continuous up-conversion "is not effective in a scene having few motions such as a still picture." *Id*. at 1:28-30. When these older techniques are "conducted regardless of the image state"—that is, without considering whether the image is a dynamic action scene or a static picture—it leads to a situation where "the amount of signal

processing that is not effective increases." *Id*. at 1:32-35. This unnecessary processing not only fails to enhance the viewing of low-motion content but also results in increased "power consumption of the apparatus." *Id*. at 1:38-40.

47. The '007 Patent solved these problems by providing "a technique capable of converting the frame rate efficiently." *Id*. at 1:41-42. The innovation lies in the adaptive approach: "In accordance with the present invention, frame rate conversion processing is conducted on an input image signal having a predetermined frame rate on the basis of information concerning the input image signal." *Id*. at 1:43-46. This allows the frame rate to be "changed flexibly according to the image kind (such as the scene or motion amount)," which in turn facilitates an innovative conversion processing and helps to save power. *Id*. at 1:59-61. The information concerning the image signal may include, for example, a motion in the image, genre information of a program corresponding to the input image signal, or information concerning the signal state of the input image signal, such as the receiving state, the transfer rate or the transmission bit error rate. *Id*. at 1:47-58.

48. Prior to the priority date of the '007 Patent, image processing apparatuses performing frame rate up-conversion did so regardless of the image state, leading to performing ineffective signal processing and increased power consumption. *Id*. at 1:24-40. The asserted claims of the '007 Patent brought an improved solution to these systems by dynamically adjusting the frame rate based on detected motion amount, program genre, or signal state. For example, the frame rate converter conducts a first frame rate conversion processing to generate an output signal having a first frame rate which is higher than the frame rate of the input image signal when the detected motion amount is at least a first predetermined value, and conducts a second frame rate conversion processing to generate an output signal having a second frame rate which is higher than

the first frame rate when the motion amount detected is at least a second predetermined value which is greater than the first predetermined value. *Id*. at Claim 1. This results in a dynamic and innovative frame rate conversion that saves power by only performing up-conversion when it would actually benefit the viewing display.

49.      The claims of the '007 Patent are not directed to an abstract idea. Rather, they provide specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components. The claim elements are not well-understood, routine, or conventional—they are specific configurations of hardware and software that allow an image processing apparatus to dynamically detect motion amounts in input image signals, acquire genre information of programs, monitor signal states such as throughput and transmission bit error rates, and adaptively convert frame rates based on this acquired information. '007 Patent at Claims 1-13. These capabilities were not previously available and represent a marked technical improvement to the functionality of image processing systems.

50.      The components of the '007 Patent are not generic or conventional. For example, the '007 Patent discloses an input unit, resolution converter, image memory, feature detector serving as an information acquisition unit, frame rate converter (FRC), timing controller, drive frequency changeover unit, motion detector, and display unit such as a PDP or LCD working in coordination to achieve the claimed functionality. *Id*. at 2:63-3:15; Fig. 2; Claims 1-13. The unconventional frame rate converter includes a frame number comparator, motion vector detector, vector adjuster, interpolation frame generator, and memory interface that work together to generate interpolation frames and conduct an unconventional and innovative frame rate conversion. *Id*. at 4:50-5:30, Figs. 4, 5. The claimed components operate in a coordinated architecture in which the

12

information acquisition unit extracts characteristics of the input signal, the frame rate converter generates interpolation frames using motion vectors, and the timing controller drives the display at a rate corresponding to the dynamically determined frame rate. When viewed as a whole, the claimed elements work together in a specific, non-conventional manner to achieve functionality not present in routine or generic computer implementations. The following features, for example, go beyond conventional computer operations: (1) dynamic detection of motion amount in input image signals using frame-to-frame comparison; (2) adaptive frame rate conversion based on detected motion amount with multiple threshold values; (3) generation of interpolation frames using motion vector detection and vector adjustment; (4) frame rate conversion based on program genre information acquired from EIT data; and (5) frame rate adjustment based on signal state including throughput and transmission bit error rate. *Id*. at Claims 1-13; 2:63-4:45. This ordered combination reflects a departure from well-understood, routine, and conventional techniques and therefore constitutes an unconventional inventive concept.

51.     These features produce specific, tangible technical benefits: flexible frame rate conversion that only up-converts when beneficial to the viewing display, reduced power consumption by lowering drive frequency when displaying still images or low-motion content, optimized viewing for different program genres (sports, movies, and news), and graceful degradation of frame rate when signal quality is poor to alleviate users' frustration brought about by video image freezing. *Id*. at 2:52-54; 9:57-64; 11:14-35. These concrete improvements distinguish the claims from abstract ideas lacking such technological benefits. According to the present invention, the frame rate can be changed flexibly according to the image kind (such as the scene or motion amount) and the frame rate conversion can be conducted dynamically. *Id*. at 1:59-63.

52.     The '007 Patent has also been cited 72 times including by Sony Corp. (e.g., JP2013191938A), Canon Inc. (e.g., JP2011227153A), NEC (e.g., JP5882940B2), Panasonic Corp. (e.g., JP2009071809A), Nvidia Corporation (e.g., US8334857B1), Arm Limited (e.g., US9349156B2), Apple Inc. (e.g., US9355585B2), Pixelworks Inc. (e.g., US10230920B1), Samsung Electronics Co. Ltd. (e.g., US11715410B2), Mediatek Inc. (e.g., US9973707B2), and others. The patents (and entities) citing the '007 Patent recognize that the '007 Patent was directed to technical improvement of image processing and frame rate conversion.

53.     Defendant has directly infringed one or more claims of the '007 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 10, and 12 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example, products known as the LG 55QNED85A television.

54.     The LG 55QNED85A is a television with options to accept predetermined frame rate image signals from a variety of sources such as streaming services, game consoles, Blu-ray players, or cable/satellite boxes, through an HDMI, Composite, USB, Ethernet, Wi-Fi (including streaming services such as Amazon Prime), or RF ports (Antenna/Cable).



15





## Connectivity
Available connectivity ports, slots and interfaces.

| Connectivity | |
| --- | --- |
| Information about the available connectivity ports, slots and interfaces such as USB, infrared port, SD card slot, audio/video and network interfaces, etc. | ▸ 2 x USB 2.0 (Type-A; downstream)<br>▸ 1 x Ethernet RJ45<br>▸ 4 x HDMI 2.1<br>▸ 1 x Cable/Antenna In (F-type female)<br>▸ 1 x Optical Audio Out<br>▸ 1 x RS232 (C) |
| | ▸ High-bandwidth Digital Content Protection (HDCP) 2.2<br>▸ SIMPLINK (HDMI-CEC)<br>▸ Auto Low Latency Mode (ALLM)<br>▸ Enhanced Audio Return Channel (eARC)<br>▸ High Frame Rate (HFR)<br>▸ Variable Refresh Rate (VRR) |

55.     The LG 55QNED85A has an α8 AI Processor 4K Gen 2 that acquires information about the input image signal during a specific picture mode or when the "TruMotion" feature is enabled. The processor also acquires information about the signal state and genre of the program being displayed.





**System on Chip (SoC)**

Information about the central processor, graphic processor and the memory of the model.

| Processor brand name | |
|---|---|
| Brand name of the processor trademarked by the manufacturer. | α8 Gen 2 AI Processor 4K |
| **CPU cores** | |
| The software instructions are performed by the CPU cores. The higher number of cores allows for the parallel (simultaneous) processing of more instructions and achieving higher performance. There are various processors equipped with 1, 2, 4, 6, 8, and more cores. | 4 |

56.    Further, on information and belief, the α8 AI Processor 4K Gen 2 has a frame rate converter for converting the frame rate of the input image signal by processing the input image signal and adjusting the frame rate of the output signal based on the content type. The frame rate converter operates through the TruMotion functionality, which includes settings such as "Natural," "Cinematic Movement," and "Smooth Movement" that leverage the processor's analysis engine to adjust the frame rate depending on the detected content type.





57.     In addition, on information and belief, the α8 AI Processor 4K Gen 2 detects a motion amount in the input image signal and performs multi-level frame rate conversion depending on the magnitude of the detected motion. When the detected motion amount is at least a first predetermined value, the frame rate converter conducts a first frame rate conversion to generate an output signal having a first frame rate higher than the frame rate of the input image signal.

58.     Further, on information and belief, the frame rate converter in the LG 55QNED85A also converts the frame rate of an image signal corresponding to the program on the basis of genre information and signal state acquired by the information acquirer. For example, the α8 AI Processor 4K Gen 2 uses "Auto Filmmaker Mode" to automatically detect when movie-genre

content is being played, such as from Amazon Prime Video, and applies Filmmaker Mode, setting

TruMotion to "Off" to preserve cinematic intent.







59.    When a standard broadcast signal is detected, the processor applies TruMotion set to "Natural." If the user manually disables Filmmaker Mode, TruMotion is automatically restored to "Natural."





60.     The foregoing features and capabilities of the LG 55QNED85A, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 10, and 12 of the '007 Patent, under 35 U.S.C. § 271(a).

61.     On information and belief, Defendant further infringes the '007 Patent through additional products (collectively, "the '007 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the LG 55QNED85A television. The '007 Accused Products include, by way of examples, LGE's OLED Series televisions including 55G6, 65G6, 77G6, 83G6, 97G6, 42C6, 48C6, 55C6, 65C6, 77C6H, 83C6H, 55B6, 65B6, 77M5, 55G5, 65G5, 77G5, 83G5, 97G5, 42C5, 48C5, 55C5, 65C5, 77C5, 83C5, 48B5, 55B5, 65B5, 77B5, 83B5, 55G4, 65G4, 77G4, 83G4, 97G4, 42C4, 48C4, 55C4, 65C4, 77C4, 83C4, 48B4, 55B4, 65B4, 77B4, 83B4, 77M3, 83M3, 97M3, 55G3, 65G3, 77G3, 83G3, 42C3, 48C3, 55C3, 65C3, 77C3, 83C3, 55B3, 65B3, 77B3, 55G2, 65G2, 77G2, 83G2, 97G2, 42C2, 48C2, 65C2, 77C2, 83C2, 55B2, 65B2, 77B2, 55G1, 65G1, 77G1, 48C1, 65C1, 77C1, 55B1, 65B1, 77B1, and 77T4; QNED Mini LED Series televisions including 55QNED90B, 65QNED90B, 75QNED90B, 86QNED90B, 115QNED90B, 65QNED9M, 75QNED9M, 55QNED85A, 65QNED85A, 75QNED85A, 86QNED85A, 100QNED85A, 50QNED85T, 98QNED85T, 75QNED99T, 86QNED99T, 55QNED85T, 65QNED85T, 75QNED85T, 86QNED85T, 75QNED99, 86QNED99, 65QNED90T, 75QNED90T, 86QNED90T, 43QNED82A, 50QNED82A, 55QNED82A, 65QNED82A, 75QNED82A, 86QNED82A, 65QNED92A, 75QNED92A, 85QNED92A, 43QNED70A, 50QNED70A, 55QNED70A, 65QNED70A, 75QNED70A, 86QNED70A, 43QNED75, 50QNED75, 55QNED75, 65QNED75, 75QNED75, 65QNED85TAA, and 75QNED85TAA; NanoCell Series televisions including 65NANO99, 75NANO99,

25

86NANO99, 65NANO95, 75NANO95, 55NANO90, 65NANO90, 75NANO90, 86NANO90, 49NANO85, 55NANO85, 65NANO85, and 75NANO85; LGE televisions including OLED77T4PUA, 98UT9000PUA, 43UA77, 50UA77, 55UA77, 65UA77, 75UA77, 86UA77, 50UT7570PUB, 55UT7570PUB, 65UT7570PUB, 43UA7100, 55UA7100, 75UA7100, 43UT8000, 50UT8000, 55UT8000, 65UT8000, 70UT8000, 75UT8000, 43UA7000, 50UA7000, 55UA7000, 75UA7000, 43UQ7590, 70UQ7590, 75UQ7590, 86UQ7590, 43UA75, 50UA75, 55UA75, 65UA75, 75UA75, 86UA75, 50UQ7070ZUE, 55UQ7070ZUE, 65UQ7070ZUE, 43UR9000, 50UR9000, 55UR9000, 65UR9000, and 75UR9000. These additional products each include all necessary hardware and operating systems and work as described above with respect to the exemplary LG television, the LG 55QNED85A. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '007 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

62. Defendant has indirectly infringed at least claims 1, 10, and 12 of the '007 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing, including through the actions of wholly-owned subsidiaries, the use, offering for sale, selling, or importation of at least the '007 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '007 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the LG 55QNED85A located at the following website: https://www.lg.com/us/support/product/lg-

55QNED85AUA.AUS. Defendant is thereby liable for infringement of the '007 Patent pursuant to 35 U.S.C. § 271(b).

63.     Defendant has indirectly infringed at least claims 1, 10, and 12 of the '007 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '007 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '007 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

64.     For example, the '007 Accused Products include an input unit to which an image signal is input, an information acquirer for acquiring information concerning the input image signal, a frame rate converter, and a display unit for displaying the image. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '007 Patent pursuant to 35 U.S.C. § 271(c).

65.     Defendant has been on notice of the '007 Patent since at the latest, July 19, 2021. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 10, and 12 of the '007 Patent.

66.     Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '007 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least July 19, 2021, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '007 Patent, and that the '007 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '007 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '007 Patent.

67.     Maxell has been damaged by Defendant's infringement of the '007 Patent.

### COUNT 2 – INFRINGEMENT OF U.S. PATENT NO. 10,219,020

68.     Maxell incorporates paragraphs 1-67 above by reference.

69.     U.S. Patent No. 10,219,020 (the "'020 Patent," attached hereto at Exhibit 2) duly issued on February 26, 2019, and is entitled *Portable Terminal, Information Processing Apparatus, Content Display System and Content Display Method.*

70.     Maxell is the owner of the '020 Patent and possesses all rights under the '020 Patent, including the exclusive right to recover for past and future infringement.

71.     The '020 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

72.     Like other validity issues, a patent is presumed eligible under 35 U.S.C. §101, and can only be found ineligible by clear and convincing evidence. The '020 Patent is patentable under

35 U.S.C. § 101. It is not directed to an abstract idea. It provides specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components, such that it does not preempt the technological field.

73.     The claims of the '020 Patent are not directed to an abstract idea and are not limited to technology that is well-understood, routine, or conventional. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting content display systems and methods.

74.     The '020 Patent is directed to a display apparatus, such as a smart television, that can be controlled by an external mobile terminal, such as a smartphone, to start, control, and stop video content acquired via the internet. '020 Patent at 3:12-33. The '020 Patent specifically relates to casting content from an external mobile device to a television and then controlling that video content based on specific information received from the external mobile device. *Id*. The '020 Patent claims are directed to controlling the display apparatus to display broadcast TV content and to terminate that display in response to information received from the external mobile device to control a second video content acquired via the internet. *Id*. at Claims 1-30. The '020 Patent claims are also directed to executing commands from the remote controller, which is different from the external mobile terminal. *Id*.

75.     Prior to the filing of the '020 Patent application, internet video relay systems could not be seamlessly operated by a single mobile terminal, and instead needed additional operation of the display either directly by an operation input or by the use of additional remote controls. *See e.g.*, *id*. at 2:53-61. Furthermore, operators of these prior art systems would need to first terminate viewing in the mobile terminal in order to then view it on a separate screen. *See e.g.*, *id*. at 2:45-

52. This caused interruption in viewing. According to the portable terminal described in the prior art, the user was required to terminate the viewing on the portable terminal and then select from a list of programs viewed in the past a program to be reproduced by the video playback device, which led to an increase in the number of operation steps. *Id*. Further, "change-over operations" of internet content from the mobile terminal to another display device caused numerous problems.

76.     The asserted claims of the '020 Patent recite an improved information processing apparatus. Specifically, they recite an improved video relay system with specific means of controlling the display video state of a display device according to distinct action-triggering information acquired and received from a mobile terminal. '020 Patent at Claim 1. The identifier and instructions received by the display apparatus from the mobile terminal constitutes specific state information that triggers operation of the display in a specific manner, e.g., by passing a URL of target video content, login authentication information, cookie information, or the position of a scroll bar or pointer indicating a relative position of the video. *Id*. at 10:44-54, 17:38-57. This achieves an improved level of video relaying that provides an advancement over the prior art systems, enabling the continuous reproduction of internet video content and the smooth cooperative operation when the viewing of a content that is being viewed on a portable terminal but is to be relayed or passed to a separate video playback display device. *Id*. at 3:8-33.

77.     Prior to the priority date of the '020 Patent, video relay systems that display content acquired via the internet were not controlled solely by a mobile terminal by action-triggering information. The specification expressly states that "description has not been given of an idea to achieve a smoother cooperative operation when the viewing of a content just being conducted on the portable terminal is to be relayed or passed to the video playback device." *Id*. at 3:6-11. The asserted claims of the '020 Patent claim an improved solution to these systems by the use of

30

instructions (the claimed identifier) from the mobile terminal to control the display unit to perform change-over and operation of internet video content between the devices uninterruptedly. *Id*. at Claim 1. For example, when the TV set receives the URL of the internet site from the cellular phone via the data transmitting and receiving unit, and after the URL transmission or in concurrence therewith, the display of the internet site on the cellular phone is terminated. *Id*. at 19:19-29. This results in the smooth, uninterrupted, and seamless relay of internet video content to a separate display device from a mobile terminal. Without conducting any operation for the terminal which desires to display an internet site, the user can display the internet site on a larger screen through a simple operation using only the mobile terminal. *Id*. at 12:29-41. Also, the user can continuously employ the mobile terminal to operate the terminal which has displayed the internet site. *Id*. The user is capable of smoothly conducting a change-over of the display of the internet site between different terminals. *Id*.

78. The claims of the '020 Patent are not directed to an abstract idea. Rather, they provide specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components. The claim elements are not well-understood, routine, or conventional—they are specific configurations of hardware and software that allow a display apparatus to seamlessly receive content identifiers from an external mobile terminal, acquire and display content using those identifiers, and accept remote operation instructions from the mobile terminal. These capabilities were not previously available and represent a marked technical improvement to the functionality of content display systems. *Id*. at Claims 1-30.

79. The components of the '020 Patent are not generic or conventional. For example, the video processing unit 205 includes specialized processing devices such as an Application

31

Specific Integrated Circuit (ASIC), a Field Programmable Gate Array (FPGA), and a Micro Processing Unit (MPU). *Id*. at 5:40-43. When viewed as a whole, the claimed elements work together in a specific, non-conventional manner to achieve functionality not present in routine or generic computer implementations. The following features, for example, go beyond conventional computer operations: (1) seamless single-operation content transfer with automatic URL transmission and display termination on the mobile terminal; (2) bidirectional control enabling the display apparatus to be remotely controlled by the mobile terminal for displayed internet content; (3) operation history transmission allowing the display apparatus to replicate content state without re-authentication; and (4) coordinated communication using the display apparatus's separate radio receiver and IR receiver pathways. *Id*. at Claim 1; 7:63-8:45.

80.     These features produce specific, tangible technical benefits: reduced operation steps (from multiple to a single button press), seamless viewing continuation when transitioning between screens, enhanced remote operation capability, and authentication preservation for dynamically changing content. *Id.* at 2:45-3:8, 12:14-28. These concrete improvements distinguish the claims from abstract ideas lacking such technological benefits. The smooth access change-over associated with the internet communication between a plurality of terminals is achievable even if the mobile terminal is replaced with any other information processing terminal. *Id*. at 4:39-50.

81.     The '020 Patent family has also been cited 110 times including by LGE (e.g., EP2573247B1, US20140191856A1), Apple Inc. (e.g., US10972536B2), Sony Corp. (e.g., US9503773B2), Microsoft Corp. (e.g., US20110296472A1), Google Inc. (e.g., US20120050183A1), Amazon Technologies Inc. (US9195768B2), Samsung Electronics Co. Ltd. (e.g., EP2768231A4), Panasonic (e.g., US9372564B2), Toshiba Corp. (e.g., JP2013131163A), Sonos, Inc. (e.g., US9654821B2), Qualcomm Inc. (e.g., US20160174272A1), and others. The

32

patents (and entities) citing the '020 Patent family recognize that the '020 Patent was directed to technical improvement in wireless communication with video display apparatuses.

82.   Defendant has directly infringed one or more claims of the '020 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 21, 24, and 28 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the LG 55QNED85A.

83.   The LG 55QNED85A is a smart television with a display, which can connect to a wireless network to access the internet through its wireless adapter and can receive content through its applications. It can also display broadcast television. The photograph below shows the LG 55QNED85A displaying broadcast television. The LG 55QNED85A can receive digital television broadcast signals over the air or over cable, for example, RF Input or via cable, in digital formats such as ATSC/QAM and can de-multiplex the digital broadcast signal into video and audio to display on its display and output on its speaker or audio output channels. The LG 55QNED85A also has a video processor, such as a graphic processor, for converting the format of video data and an audio processor, such as a system processor, for converting the format of audio data.



84.     The LG 55QNED85A comes preconfigured with icons for streaming services such as Netflix, Amazon Prime Video, and Disney+ on its home screen, as well as dedicated hardware buttons for certain streaming services on the Magic Remote. Upon a single user selection of an icon or dedicated button, the television automatically initiates the download and installation of the selected application without requiring any additional user input. This design demonstrates that the LG 55QNED85A is configured out of the box as a display apparatus for displaying video content acquired via the internet.





85.     The LG 55QNED85A is equipped with a network interface allowing it to communicate with other devices on the same network, such as Wi-Fi enabled mobile terminals such as smartphones and allowing it to receive data from an external mobile terminal. For example, the LG 55QNED85A incorporates built-in Wi-Fi and Wi-Fi Direct interfaces for receiving data from an external mobile terminal. The LG 55QNED85A also has an infra-red (IR) receiver that receives commands from its remote controller that is different from the external mobile terminal.

86.     The LG 55QNED85A has a system processor, the α8 AI Processor 4K Gen 2, configured to control the operation of the LG 55QNED85A, including its display. The system processor controls the display to show a first video content received via a broadcast signal, and also responds to communications received over its network interface from an external mobile terminal. The LG 55QNED85A is configured to receive an identifier for identifying a second video content from the external mobile terminal through one or more protocols supported by the device. When the external mobile terminal transmits a communication containing such an identifier, the system processor terminates display of the first video content and launches the appropriate application to acquire and display the second video content via the internet. This is shown in the screenshots below from the LG 55QNED85A.









87.    The processor in the LG 55QNED85A executes operation instructions received from the external mobile terminal via the radio receiver, for example its Wi-Fi adapter, while the second video content is being displayed, including playback control instructions received from the mobile terminal. This is shown in the screenshots below from the LG 55QNED85A.







88. The foregoing features and capabilities of the LG 55QNED85A, and LGE's description and/or demonstration thereof, including in user manuals and advertising, reflect LGE's direct infringement by satisfying every element of at least claims 1, 21, 24, and 28 of the '020 Patent, under 35 U.S.C. § 271(a).

89. On information and belief, Defendant further infringes the '020 Patent through additional products utilizing the same or reasonably similar functionalities as described above with respect to the LG 55QNED85A (collectively, "the '020 Accused Products"). The '020 Accused Products include, by way of examples, LGE's OLED Series televisions including 55G6, 65G6, 77G6, 83G6, 97G6, 42C6, 48C6, 55C6, 65C6, 77C6H, 83C6H, 55B6, 65B6, 77M5, 55G5, 65G5, 77G5, 83G5, 97G5, 42C5, 48C5, 55C5, 65C5, 77C5, 83C5, 48B5, 55B5, 65B5, 77B5, 83B5,

55G4, 65G4, 77G4, 83G4, 97G4, 42C4, 48C4, 55C4, 65C4, 77C4, 83C4, 48B4, 55B4, 65B4, 77B4, 83B4, 77M3, 83M3, 97M3, 55G3, 65G3, 77G3, 83G3, 42C3, 48C3, 55C3, 65C3, 77C3, 83C3, 55B3, 65B3, 77B3, 55G2, 65G2, 77G2, 83G2, 97G2, 42C2, 48C2, 65C2, 77C2, 83C2, 55B2, 65B2, 77B2, 55G1, 65G1, 77G1, 48C1, 65C1, 77C1, 55B1, 65B1, 77B1, and 77T4; QNED Mini LED Series televisions including 55QNED90B, 65QNED90B, 75QNED90B, 86QNED90B, 115QNED90B, 65QNED9M, 75QNED9M, 55QNED85A, 65QNED85A, 75QNED85A, 86QNED85A, 100QNED85A, 50QNED85T, 98QNED85T, 75QNED99T, 86QNED99T, 55QNED85T, 65QNED85T, 75QNED85T, 86QNED85T, 65QNED90T, 75QNED90T, 86QNED90T, 75QNED99, 86QNED99, 43QNED82A, 50QNED82A, 55QNED82A, 65QNED82A, 75QNED82A, 86QNED82A, 65QNED92A, 75QNED92A, 85QNED92A, 43QNED70A, 50QNED70A, 55QNED70A, 65QNED70A, 75QNED70A, 86QNED70A, 43QNED75, 50QNED75, 55QNED75, 65QNED75, 75QNED75, 65QNED85TAA, and 75QNED85TAA; NanoCell Series televisions including 65NANO99, 75NANO99, 86NANO99, 65NANO95, 75NANO95, 55NANO90, 65NANO90, 75NANO90, 86NANO90, 49NANO85, 55NANO85, 65NANO85, and 75NANO85;  LGE televisions including OLED77T4PUA, 98UT9000PUA, 43UA77, 50UA77, 55UA77, 65UA77, 75UA77, 86UA77, 50UT7570PUB, 55UT7570PUB, 65UT7570PUB, 43UA7100, 55UA7100, 75UA7100, 43UT8000, 50UT8000, 55UT8000, 65UT8000, 70UT8000, 75UT8000, 43UA7000, 50UA7000, 55UA7000, 75UA7000, 43UQ7590, 70UQ7590, 75UQ7590, 86UQ7590, 43UA75, 50UA75, 55UA75, 65UA75, 75UA75, 86UA75, 50UQ7070ZUE, 55UQ7070ZUE, 65UQ7070ZUE, 43UR9000, 50UR9000, 55UR9000, 65UR9000, and 75UR9000. These additional products each include all necessary hardware and operating systems and work as described above with respect to the LG 55QNED85A. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate

infringing functionalities. For the avoidance of doubt, the '020 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

90.    Since July 19, 2021, LGE has indirectly infringed at least claims 1, 21, 24, and 28 of the '020 Patent in this judicial district and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the '020 Accused Products. LGE's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '020 Patent in violation of 35 U.S.C. § 271. LGE instructs its customers through at least user guides, such as those for the LG 55QNED85A located at the following website: https://www.lg.com/us/support/product/lg-55QNED85AUA.AUS. Defendant is thereby liable for infringement of the '020 Patent pursuant to 35 U.S.C. § 271(b).

91.    Since July 19, 2021, LGE has indirectly infringed at least claims 1, 21, 24, and 28 of the '020 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '020 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '020 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

92.     For example, the '020 Accused Products include a processor with software for conducting communication with a mobile terminal to cast the video content from the mobile terminal to the accused product. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not staple articles or commodities of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '020 Patent pursuant to 35 U.S.C. § 271(c).

93.     Defendant knows and intends that its continued actions will actively induce and contribute to actual infringement of at least claims 1, 21, 24, and 28 of the '020 Patent.

94.     Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '020 Patent, which has been duly issued by the USPTO, and is presumed valid. Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '020 Patent, nor could it reasonably, subjectively believe that the patent is invalid. As an example, since at least July 19, 2021, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '020 Patent, and that the '020 Patent is valid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of its likely infringement and the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '020 Patent.

95.     Maxell has been damaged by Defendant's infringement of the '020 Patent.

### COUNT 3 – INFRINGEMENT OF U.S. PATENT NO. 8,970,793

96.     Maxell incorporates paragraphs 1-95 above by reference.

97.     U.S. Patent No. 8,970,793 (the "'793 Patent," attached hereto at Exhibit 3) duly issued on March 3, 2015, and is entitled *Display Device, and Television Device*.

98.     Maxell is the owner by assignment of the '793 Patent and possesses all rights under the '793 Patent, including the exclusive right to recover for past and future infringement.

99.     The '793 Patent is directed to a display device and a television device, each of which includes a display panel with a backlight source. '793 Patent at Abstract, 1:4-8. The core aim of the invention is to inhibit light from this backlight source from leaking outward, particularly through the corner portions of the device. *Id*. at 1:56-60.

100.    The '793 Patent explains that a problem existed in conventional television receiving devices concerning light leakage. Describing prior art, the patent notes that in such devices, "clearances are formed on corner portions of outer peripheral portions of the respective ones of the bezel, the frame and the chassis, and hence there is such a problem that the light from the LED light sources leaks out of the liquid crystal display device through clearances on respective ones of corner portions of the liquid crystal display device." *Id*. at 1:49-55. This light leakage could negatively affect the visual quality and aesthetics of the display.

101.    The '793 Patent solved these problems by providing a display device with a specific construction for its substrate mounting member, which covers the backlight source. The patent specifies that "the substrate mounting member has a bottom surface portion and a side surface portion, while a corner portion of the outer peripheral portion formed by the side surface portion of the substrate mounting member has such a shape that adjacent ones of the side surface portion are bonded to each other without a clearance." *Id*. at Abstract, 2:10-18. This design ensures that "light from the backlight source covered with the substrate mounting member can be inhibited from leaking outward through the corner portion of the substrate mounting member." *Id*. at 2:18-

24. This is particularly effective even when a cover member is arranged to expose the periphery of this outer peripheral portion of the substrate mounting member, as the sealed corners prevent light escape. *Id.* at 2:24-31.

102.    Defendant has directly infringed one or more claims of the '793 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 2, 5, 7, 9, 10, 11, and 18 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example a product known as the LG 43UA7700PUB television.

103.    The LG 43UA7700PUB is a television comprising a liquid crystal display (LCD) panel, a backlight source comprising an array of LEDs positioned behind the LCD panel, and a substrate mounting member comprising a metal frame located behind the LED array, wherein the substrate mounting member covers the backlight source.





104.    The LG 43UA7700PUB contains a cover that partially covers the rear surface of the substrate mounting member, covering the mainboard circuits, and exposing a region of the substrate mounting member.



105.    The bottom and side portions of the LG 43UA7700PUB's substrate mounting member are joined together at their adjacent sides without significant gap or clearance. At the corners where these portions join, the outer peripheral surface of the substrate mounting member is formed to have a round shape.



106.    The LG 43UA7700PUB includes a circuit board mounted on the substrate mounting member, which generates heat during operation. The exposed region on the rear surface of the LG 43UA7700PUB's substrate mounting member is configured as a heat radiation portion. This exposed region radiates heat generated by at least the circuit board outward from the television. The configuration of the exposed region improves its heat transfer properties compared to regions of the substrate mounting member covered by the cover member.



107. Further, the bottom surface of the exposed region has a convex shape swelling toward the rear surface side.



108. The circuit board has an external connection terminal attached, including standard ports such as HDMI, USB, Ethernet, and Antenna/Cable In. This external connection terminal has an opening to the side underneath the cover.





109. The foregoing features and capabilities of the LG 43UA7700PUB, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect

Defendant's direct infringement by satisfying every element of at least claims 1, 2, 5, 7, 9, 10, 11, and 18 of the '793 Patent, under 35 U.S.C. § 271(a).

110.   On information and belief, Defendant further infringes the '793 Patent through additional products (collectively, "the '793 Accused Products") utilizing the same or reasonably similar functionalities as described above with respect to the LG 43UA7700PUB television. The '793 Accused Products include, by way of examples, LGE's television including 43UA7700PUB, 50UA7700PUB, 55UA7700PUB, 65UA7700PUB, 75UA7700PUB, 86UA7700PUB, 43UA7700AUA, 50UA7700AUA, 55UA7700AUA, 65UA7700AUA, 75UA7700AUA, and 86UA7700AUA. These additional products each include all necessary hardware and work as described above with respect to the exemplary LGE television, the LG 43UA7700PUB. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '793 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

111.   Defendant has indirectly infringed at least claims 1, 2, 5, 7, 9, 10, 11, and 18 of the '793 Patent in this judicial district and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the '793 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '793 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the LG 43UA7700PUB located at the following website:

https://www.lg.com/us/support/product/lg-43UA7700PUB.AUSQ?tab=1. Defendant is thereby liable for infringement of the '793 Patent pursuant to 35 U.S.C. § 271(b).

112. Defendant has indirectly infringed at least claims 1, 2, 5, 7, 9, 10, 11, and 18 of the '793 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '793 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '793 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

113. For example, the '793 Accused Products include hardware that is designed to prevent light leakage from the backlight source. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '793 Patent pursuant to 35 U.S.C. § 271(c).

114. Defendant has been on notice of the '793 Patent since at least September 19, 2025. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 2, 5, 7, 9, 10, 11, and 18 of the '793 Patent.

115. Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '793 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least September 19, 2025, Defendant has

been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '793 Patent, and that the '793 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '793 Patent, nor could they reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '793 Patent.

116.    Maxell has been damaged by Defendant's infringement of the '793 Patent.

## COUNT 4 – INFRINGEMENT OF U.S. PATENT NO. 10,321,206

117.    Maxell incorporates paragraphs 1-116 above by reference.

118.    U.S. Patent No. 10,321,206 (the "'206 Patent" attached hereto at Exhibit 4) duly issued on June 11, 2019, and is entitled *Method for Switching an Audio/Video Application, Apparatus And Smart TV*.

119.    Maxell is the owner by assignment of the '206 Patent and possesses all rights of recovery under the '206 Patent, including the exclusive right to recover for past and future infringement.

120.    The '206 Patent explains that prior art smart TV systems suffered from inefficiencies when switching between audio/video ("AV") applications because multiple applications share a common AV decoder resource. As described, conventional systems would begin loading a target application while the currently running application continued occupying the decoder, requiring the system to wait until the prior application released the decoder before

playback could begin. '206 Patent at 1:25-46, 4:57-5:3. This sequence increased switching latency and could result in undesirable playback delays and resource contention between applications.

121.    The '206 Patent addresses these problems by introducing a lightweight intermediate interface that is launched during application switching. The patent teaches starting this intermediate interface—occupying fewer resources than the target application—while moving the current application to the background and triggering it to release the AV decoder as soon as the intermediate interface is fully loaded. Because the intermediate interface loads faster than the target application, the system accelerates decoder release and enables earlier playback initiation by the target application, thereby reducing switching time and improving overall user experience. '206 Patent at 3:64-4:20, 4:57-5:3.

122.    Defendant has directly infringed one or more claims of the '206 Patent in this judicial district and elsewhere in Texas, including at least claims 1, 2, 3, 9, 10, 11, 13, and 17 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example the products known as the LG 55QNED85A.

123.    The LG 55QNED85A has several video apps (e.g., LG Channels, Netflix, Disney+, Hulu, and Amazon Prime) that can, for example, be started by instructions received from its remote control shown below.





57

124.    When a button for the app or input is pressed on the remote control, the video apps can be switched between one another, starting a preset intermediate interface (e.g., a loading screen) and setting an AV application currently in use to be a background program. This intermediate interface is shown in the exemplary screenshots below from the LG 55QNED85A when switching from Hulu to Amazon Prime Video.



125.    The intermediate interface (e.g., a loading screen) does not utilize the AV decoder and contains fewer resources and less interface content than the target AV application (e.g., Amazon Prime Video). As such, the AV decoder is released. This is shown in the exemplary screenshot below from the LG 55QNED85A, showing that the exemplary intermediate interface is a basic loading screen with no AV content.



126.    The target AV application is instructed to send a playback instruction to the AV decoder if the AV decoder is in an unoccupied state. For example, this is shown in the exemplary screenshots above, showing the target AV applications playing AV content.



127.    The foregoing features and capabilities of the LG 55QNED85A, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1, 2, 3, 9, 10, 11, 13, and 17 of the '206 Patent, under 35 U.S.C. § 271(a). On information and belief, Defendant further infringes the '206 Patent through additional products utilizing the same or reasonably similar functionalities as described above with respect to the LG 55QNED85A (collectively, "the '206 Accused Products"). The '206 Accused Products include, by way of examples, LGE's OLED Series televisions including 55G6, 65G6, 77G6, 83G6, 97G6, 42C6, 48C6, 55C6, 65C6, 77C6H, 83C6H, 55B6, 65B6, 77M5, 55G5, 65G5, 77G5, 83G5, 97G5, 42C5, 48C5, 55C5, 65C5, 77C5,

83C5, 48B5, 55B5, 65B5, 77B5, 83B5, 55G4, 65G4, 77G4, 83G4, 97G4, 42C4, 48C4, 55C4, 65C4, 77C4, 83C4, 48B4, 55B4, 65B4, 77B4, 83B4, 77M3, 83M3, 97M3, 55G3, 65G3, 77G3, 83G3, 42C3, 48C3, 55C3, 65C3, 77C3, 83C3, 55B3, 65B3, 77B3, 55G2, 65G2, 77G2, 83G2, 97G2, 42C2, 48C2, 65C2, 77C2, 83C2, 55B2, 65B2, 77B2, 55G1, 65G1, 77G1, 48C1, 65C1, 77C1, 55B1, 65B1, 77B1, and 77T4; QNED Mini LED Series televisions including 55QNED90B, 65QNED90B, 75QNED90B, 86QNED90B, 115QNED90B, 65QNED9M, 75QNED9M, 55QNED85A, 65QNED85A, 75QNED85A, 86QNED85A, 100QNED85A, 50QNED85T, 98QNED85T, 75QNED99T, 86QNED99T, 55QNED85T, 65QNED85T, 75QNED85T, 86QNED85T, 65QNED90T, 75QNED90T, 86QNED90T, 75QNED99, 86QNED99, 43QNED82A, 50QNED82A, 55QNED82A, 65QNED82A, 75QNED82A, 86QNED82A, 65QNED92A, 75QNED92A, 85QNED92A, 43QNED70A, 50QNED70A, 55QNED70A, 65QNED70A, 75QNED70A, 86QNED70A, 43QNED75, 50QNED75, 55QNED75, 65QNED75, 75QNED75, 65QNED85TAA, and 75QNED85TAA; NanoCell Series televisions including 65NANO99, 75NANO99, 86NANO99, 65NANO95, 75NANO95, 55NANO90, 65NANO90, 75NANO90, 86NANO90, 49NANO85, 55NANO85, 65NANO85, and 75NANO85; LGE televisions including OLED77T4PUA, 98UT9000PUA, 43UA77, 50UA77, 55UA77, 65UA77, 75UA77, 86UA77, 50UT7570PUB, 55UT7570PUB, 65UT7570PUB, 43UA7100, 55UA7100, 75UA7100, 43UT8000, 50UT8000, 55UT8000, 65UT8000, 70UT8000, 75UT8000, 43UA7000, 50UA7000, 55UA7000, 75UA7000, 43UQ7590, 70UQ7590, 75UQ7590, 86UQ7590, 43UA75, 50UA75, 55UA75, 65UA75, 75UA75, 86UA75, 50UQ7070ZUE, 55UQ7070ZUE, 65UQ7070ZUE, 43UR9000, 50UR9000, 55UR9000, 65UR9000, and 75UR9000. These additional products each include all necessary hardware and operating systems and work as described above with respect to the LG 55QNED85A. Maxell reserves the right to discover and

pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '206 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

128.    Since July 19, 2021, Defendant has indirectly infringed at least claims 1, 2, 3, 9, 10, 11, 13, and 17 of the '206 Patent in this judicial district and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the '206 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '206 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the LG 55QNED85A located at the following website: https://www.lg.com/us/support/product/lg-55QNED85AUA.AUS. Defendant is thereby liable for infringement of the '206 Patent pursuant to 35 U.S.C. § 271(b).

129.    Since July 19, 2021, Defendant has indirectly infringed at least claims 1, 2, 3, 9, 10, 11, 13, and 17 of the '206 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '206 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '206 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

130. For example, the '206 Accused Products include a processor that is configured to load an intermediate interface and trigger the release of its Audio/Video (AV) decoder from the current AV application to a new target AV application when switching AV applications. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '206 Patent pursuant to 35 U.S.C. § 271(c).

131. Defendant knows and intends that its continued actions will actively induce and contribute to actual infringement of at least claims 1, 2, 3, 9, 10, 11, 13, and 17 of the '206 Patent.

132. Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '206 Patent, which has been duly issued by the USPTO, and is presumed valid. Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '206 Patent, nor could it reasonably, subjectively believe that the patent is invalid. As an example, since at least July 19, 2021, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '206 Patent, and that the '206 Patent is valid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of its likely infringement and the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '206 Patent.

133. Maxell has been damaged by Defendant's infringement of the '206 Patent.

## COUNT 5 – INFRINGEMENT OF U.S. PATENT NO. 10,958,971

134. Maxell incorporates paragraphs 1-133 above by reference.

135. U.S. Patent No. 10,958,971 (the "'971 Patent," attached hereto at Exhibit 5) duly issued on March 23, 2021, and is entitled *Display Apparatus and Video Processing Apparatus*.

136. Maxell is the owner by assignment of the '971 Patent and possesses all rights under the '971 Patent, including the exclusive right to recover for past and future infringement.

137. The '971 Patent is directed to an improved display apparatus that has the ability to control wireless communication frequency in different carrier frequencies between a plurality of apparatuses such as with the Internet or local area network and a cellular phone, in order to seamlessly display high-quality video content based on received video and audio data streams without deterioration. '971 Patent at 2:22-48.

138. Prior to the filing of the application leading to the '971 Patent, display apparatuses were typically connected to video processing apparatuses through wired connections to transmit video and audio signals. It was common for interfaces, such as the High Definition Multimedia Interface (HDMI), to be used to establish connections between household apparatuses, where baseband video and high-definition audio signals were time-division multiplexed and encrypted through HDCP for transmission. However, because these interfaces were developed on the assumption of wired connections between apparatuses, consideration had not been given to maintaining connections with the internet or a home network while simultaneously viewing high-quality videos from portable video processing apparatuses such as cameras and cellular phones. '971 Patent at 1:20-44.

139. The invention claimed in the '971 Patent solved this problem by advantageously controlling the radio modem of display apparatuses to select different carrier frequencies for wireless communication. In this manner, the display apparatus may control the radio

communication to better support high-quality video communication without sacrificing other communications. '971 Patent at 2:22-48.

140.   For example, the '971 Patent discloses an embodiment wherein the display apparatus may control the radio transmission assignment such that the radio transmission rate of the modem to communicate the video information of high picture quality by radio from the cellular phone takes precedence over the radio transmission rate of the modem to connect to a network for communication, within the limited range of bands for the radio transmission, the radio modem can send video information without deteriorating the video quality of the video information having high picture quality. The frequency bands used for communication are also limited to predetermined frequency bands, thus increasing the radio wave resource efficiency and prevents the problem of interference with other apparatuses. It is therefore possible that the user continuously views videos with high picture quality on the display apparatus. '971 Patent at 2:22-48, 3:29-51.

141.   Therefore, it is possible that video information of high picture quality is continuously fed from the cellular phone to the display apparatus as well as information transmitted from the internet and a local area network. This results in a display apparatus having high serviceability. '971 Patent at 2:22-48.

142.   For example, the '971 Patent discloses an embodiment of a system wherein the information from the network and cellular phone are demodulated and fed to the processor that then determines the type of information from the network or cellular phone. If the information is, for example, a video stream compressed in a predetermined format, the processor feeds the video stream to a demultiplexer and decompression circuit for processing and the resultant signals are presented on the display. Audio information is also obtained from the network or cellular phone

and reproduced by the audio output device. The display screen may then display content based on the received stream of video data and the audio output device may output sound based on the received stream of audio data.  '971 Patent at 5:33-64, 11:34-12:14.

143.    Defendant has directly infringed one or more claims of the '971 Patent in this judicial district and elsewhere in Texas, including at least claim 1 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling their televisions, including by way of example the products known as the LG 55QNED85A.

144.    The LG 55QNED85A has a radio modem to select different carrier frequencies for wireless communication (*e.g.*, Wireless LAN, Direct Wifi) and a processor (α8 AI Processor 4K Gen 2) to control the radio modem.





145.    When a command is registered on the remote control, the processor controls the radio modem to wirelessly communicate with the Internet or a local area network over a first carrier frequency. This is shown in the exemplary screenshots below from the LG 55QNED85A, showing that the TV receives first video and audio content via the Internet over a 2.4 GHz Wi-Fi signal.









146.    When a command is registered on a cellular phone, the processor controls the radio modem to wirelessly communicate video and audio data with the cellular phone over a second carrier frequency. This is shown in the exemplary screenshots below from the LG 55QNED85A, showing that the TV receives second video and audio content over a 5 GHz Direct Wi-Fi signal.











147. The LG 55QNED85A has a display screen that displays the content of both streams received over the first and second carrier frequencies. This is shown in the exemplary screenshots below from the LG 55QNED85A, showing that the TV displays the first and second video and audio content in the picture-in-picture mode.



Second video is outputted from the screen mirror from the cellular phone while first video and audio content are displayed.



Second video and audio are outputted from the screen mirror from the cellular phone while first video content is displayed.



148.    The foregoing features and capabilities of the LG 55QNED85A, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claim 1 of the '971 Patent, under 35 U.S.C. § 271(a). On information and belief, Defendant further infringes the '971 Patent through additional products utilizing the same or reasonably similar functionalities as described above with respect to the LG 55QNED85A (collectively, "the '971 Accused Products"). The '971 Accused Products include, by way of examples, LGE's OLED Series televisions including 55G6, 65G6, 77G6, 83G6, 97G6, 42C6, 48C6, 55C6, 65C6, 77C6H, 83C6H, 55B6, 65B6, 77M5, 55G5, 65G5, 77G5, 83G5, 97G5, 42C5, 48C5, 55C5, 65C5, 77C5, 83C5, 48B5, 55B5, 65B5, 77B5, 83B5, 55G4, 65G4, 77G4, 83G4, 97G4, 42C4, 48C4, 55C4, 65C4, 77C4, 83C4, 48B4, 55B4, 65B4, 77B4, 83B4, 77M3, 83M3, 97M3, 55G3, 65G3, 77G3, 83G3, 42C3, 48C3, 55C3, 65C3, 77C3, 83C3, 55B3, 65B3, 77B3, 55G2, 65G2, 77G2, 83G2, 97G2, 42C2, 48C2, 65C2, 77C2, 83C2, 55B2, 65B2, 77B2, 55G1, 65G1, 77G1, 48C1, 65C1, 77C1, 55B1, 65B1, 77B1, and 77T4; QNED Mini LED Series televisions including 55QNED90B, 65QNED90B, 75QNED90B, 86QNED90B, 115QNED90B, 65QNED9M, 75QNED9M, 55QNED85A, 65QNED85A,

75QNED85A, 86QNED85A, 100QNED85A, 50QNED85T, 98QNED85T, 75QNED99T, 86QNED99T, 55QNED85T, 65QNED85T, 75QNED85T, 86QNED85T, 65QNED90T, 75QNED90T, 86QNED90T, 75QNED99, 86QNED99, 43QNED82A, 50QNED82A, 55QNED82A, 65QNED82A, 75QNED82A, 86QNED82A, 65QNED92A, 75QNED92A, 85QNED92A, 43QNED70A, 50QNED70A, 55QNED70A, 65QNED70A, 75QNED70A, 86QNED70A, 43QNED75, 50QNED75, 55QNED75, 65QNED75, 75QNED75, 65QNED85TAA, and 75QNED85TAA; NanoCell Series televisions including 65NANO99, 75NANO99, 86NANO99, 65NANO95, 75NANO95, 55NANO90, 65NANO90, 75NANO90, 86NANO90, 49NANO85, 55NANO85, 65NANO85, and 75NANO85; LGE televisions including OLED77T4PUA, 98UT9000PUA, 43UA77, 50UA77, 55UA77, 65UA77, 75UA77, 86UA77, 50UT7570PUB, 55UT7570PUB, 65UT7570PUB, 43UA7100, 55UA7100, 75UA7100, 43UT8000, 50UT8000, 55UT8000, 65UT8000, 70UT8000, 75UT8000, 43UA7000, 50UA7000, 55UA7000, 75UA7000, 43UQ7590, 70UQ7590, 75UQ7590, 86UQ7590, 43UA75, 50UA75, 55UA75, 65UA75, 75UA75, 86UA75, 50UQ7070ZUE, 55UQ7070ZUE, 65UQ7070ZUE, 43UR9000, 50UR9000, 55UR9000, 65UR9000, and 75UR9000. These additional products each include all necessary hardware and operating systems and work as described above with respect to the LG 55QNED85A. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '971 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

149. Since July 19, 2021, Defendant has indirectly infringed at least claim 1 of the '971 Patent in this judicial district and elsewhere in the United States by, among other things, and

including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the '971 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '971 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the LG 55QNED85A located at the following website: https://www.lg.com/us/support/product/lg-55QNED85AUA.AUS. Defendant is thereby liable for infringement of the '971 Patent pursuant to 35 U.S.C. § 271(b).

150. Since July 19, 2021, Defendant has indirectly infringed at least claim 1 of the '971 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '971 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '971 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

151. For example, the '971 Accused Products include a radio modem and a processor that are configured to receive first and second video and audio content from a first carrier frequency over the internet or a local area network and a second carrier frequency from a cellular phone. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce

78

suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '971 Patent pursuant to 35 U.S.C. § 271(c).

152.    Defendant knows and intends that its continued actions will actively induce and contribute to actual infringement of at least claim 1 of the '971 Patent.

153.    Defendant undertook and continued its infringing actions despite an objectively high likelihood that such activities infringed the '971 Patent, which has been duly issued by the USPTO, and is presumed valid. Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '971 Patent, nor could it reasonably, subjectively believe that the patent is invalid. As an example, since at least July 19, 2021, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '971 Patent, and that the '971 Patent is valid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's knowledge of its likely infringement and the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '971 Patent.

154.    Maxell has been damaged by Defendant's infringement of the '971 Patent.

### COUNT 6 – INFRINGEMENT OF U.S. PATENT NO. 10,650,780

155.    Maxell incorporates paragraphs 1-154 above by reference.

156.    U.S. Patent No. 10,650,780 (the "'780 Patent," attached hereto at Exhibit 6) duly issued on May 12, 2020, and is entitled *Display Apparatus.*

157.    Maxell is the owner by assignment of the '780 Patent and possesses all rights under the '780 Patent, including the exclusive right to recover for past and future infringement.

158. The '780 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

159. Like other validity issues, a patent is presumed eligible under 35 U.S.C. §101, and can only be found ineligible by clear and convincing evidence. The '780 Patent is patentable under 35 U.S.C. § 101. It is not directed to an abstract idea. It provides specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific unconventional components, such that it does not preempt the technological field.

160. The claims of the '780 Patent are not directed to an abstract idea and are not limited to technology that is well-understood, routine, or conventional. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting image display systems and methods.

161. Prior to the priority date of the '780 Patent, image display apparatuses were not capable of seamlessly handling the different requirements between image interface circuitry and networks in order to receive image information from different sources and in different manners in a uniform interface. '780 Patent at 1:36-67. The IEEE 1394 standard, the HDMI standard, and different network standards used by local area networks (LAN) and wireless networks, have different requirements and limitations, and therefore created various problems of interoperability and source switching for implementation in a single digital apparatus and uniform interface. *Id*. at 1:56-67. Moreover, prior systems were premised on connection between stationary apparatuses installed in homes and it was not sufficiently considered that the image display apparatuses are

connected with portable apparatuses such as digital cameras and mobile telephones conveniently. *Id.* at 2:1-6.

162.    For example, as explained in the '780 Patent, in the HDMI system, a baseband signal of an uncompressed high definition picture signal and audio signals are transmitted, and an apparatus which receives the transmitted high definition picture signal does not record the received signal. *Id.* at 1:65-67. Such interface is also capable of higher bandwidth and therefore may be subjected to different encryption processing such as High-Bandwidth Digital Content Protection (HDCP). *Id.* at 1:46-51. On the other hand, the USB circuitry and HDMI interfaces transmit still pictures as compressed picture information, but do so in different ways with their own set of requirements and limitations (such as bandwidth limitations), transmitted via a cable versus wirelessly. *Id.* at 15:26-46. In addition to these interoperability issues, these dissimilarities also created difficulties in providing a single user interface for those devices. The '780 Patent addressed these problems by providing a technique for improving the convenience in case where pictures obtained by a portable image apparatus such as, for example, a digital camera and mobile telephone are displayed in a display apparatus. *Id.* at 2:7-12.

163.    The asserted claims of the '780 Patent provide improvements over the prior art by the unconventional use of a first signal, a second signal, and a predetermined time interval, to conduct and display a slide show in a specific manner with one user interface, supporting images received by dissimilar interface circuitry, such as from USB and wireless LAN interfaces, and thus solving the issues of interoperability and source switching in image display devices. *Id.* at Claim 1. More specifically, the claimed "first signal," "second signal," and "predetermined time interval" allow the image display apparatus to better switch and interact with external image devices (e.g., digital cameras) connected through the distinct circuitry required by the claims, the USB and

wireless LAN interface circuitry. *Id*. The signals of the claimed invention are transmitted via the USB and wireless LAN and the processing from the transmission of the image request signal to the conversion processing of the picture signal for display by the image stream signalization circuit is repeated at predetermined time intervals. *Id*. at 2:13-26, 16:65-17:11. This enables the image signals to be subjected to the appropriate processing necessary to enable interoperability between the interface circuitry.

164.    For example, the USB interface circuitry transmits, over the USB cable, a first signal to the digital camera for causing the digital camera to output compressed first image information corresponding to first still pictures, and receives, over the cable, the compressed first image information corresponding to first still pictures output from the digital camera. *Id*. at Claim 1. The wireless LAN interface circuitry wirelessly transmits, over the network, a second signal to the digital camera for causing the digital camera to output compressed second image information corresponding to second still pictures, and wirelessly receives, over the network, the compressed second image information corresponding to second still pictures output from the digital camera. *Id*. The picture data may also be processed at predetermined time intervals, (e.g., resizing, rotation, and/or conversion) in order for it to be properly displayed. *Id*. at Fig. 10, 15:65-16:21. This results in the convenience of viewing a slide show on an image display apparatus that connects to external devices (e.g., digital cameras), without the interoperability issues caused by the diverse circuitry of those external devices. *Id*. at 2:18-25.

165.    Prior to the priority date of the '780 Patent, image display apparatuses did not conduct a slide show from images in an external image device connected to the display through interface circuitry containing different underlying operational requirements and limitations, and further could not provide for a single user interface for doing so. *Id*. at 2:1-6. But, as explained

82

above, the recitations of the asserted claims enable the switching of and interoperability between the USB and wireless LAN interfaces, resulting in an image display apparatus with different interfaces—an improved computer hardware device. The asserted claims of the '780 Patent brought an improved solution to these systems by the use of instructions from the image display apparatus to control the external image device to perform change-over and operation of image content between the devices. *Id.* at Claim 1. This results in the smooth, uninterrupted, and seamless relay of image content from an external image device to the image display apparatus through either USB or wireless LAN interfaces.

166. The claims of the '780 Patent are not directed to an abstract idea. Rather, they provide specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components. The claim elements are not well-understood, routine, or conventional—they are specific configurations of hardware and software that allow an image display apparatus to seamlessly receive image information from an external image device through either USB or wireless LAN interfaces, decode the compressed image information, resize and apply effects to the images, and display a slide show at predetermined intervals. *Id.* at Claim 1-4. These capabilities were not previously available in a unified interface and represent a marked technical improvement to the functionality of image display systems.

167. The components of the '780 Patent are not generic or conventional. For example, the '780 Patent discloses a JPEG decoder circuit, resize and effect addition circuit, image stream signalization circuit, USB host interface circuit, and LAN and DLNA interface circuit working in coordination in an unconventional arrangement to achieve the claimed functionality. *Id.* at Figs. 1-2, 15:56-16:21, Claims 1-20. When viewed as a whole, the claimed elements work together in a

specific, non-conventional manner to achieve functionality not present in routine or generic computer implementations. The following features, for example, go beyond conventional computer operations: (1) seamless switching between USB and wireless LAN interfaces for image acquisition; (2) transmission of first and second signals to cause external devices to output compressed image information through different interface types; (3) decoding, resizing, and effect processing of images at predetermined intervals; and (4) coordinated slide show display supporting multiple interface types. *Id*. at Claim 1. This ordered combination reflects a departure from well-understood, routine, and conventional techniques and therefore constitutes an unconventional inventive concept.

168. The claims of the '780 Patent include an inventive concept sufficient to distinguish them from generic computer implementations. The '780 Patent family has also been cited by Sony Corp (e.g., JP2010170388A), Sanyo Electric Co. Ltd. (e.g., US20100188576A1), Cisco Technology Inc. (e.g., US10382597B2), Caterpillar Inc. (e.g., US10889958B2), and others. The patents (and entities) citing the '780 Patent family recognize that the '780 Patent was directed to technical improvement in image display apparatuses.

169. Defendant has directly infringed one or more claims of the '780 Patent in this District and elsewhere in Texas, including at least claims 1-4, and 6 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling its televisions, including by way of example the LG 55QNED85A.

170. The LG 55QNED85A is a smart television that can display images from various sources, including broadcasted television content, and externally connected sources. The LG 55QNED85A has USB ports for receiving and processing image information for display on the display of the television and a wireless LAN interface for receiving and processing image

information received wirelessly. The LG 55QNED85A is equipped with a USB port and wireless

LAN interface, allowing it to display, for example, compressed images stored on a digital camera.





171.    The LG 55QNED85A includes a central processor or comparable hardware or

software that decodes compressed image information (e.g., JPEG, PNG, and GIF) received by the

USB port or wireless LAN interface from, for example, a digital camera.



172.   The LG 55QNED85A also includes the functionality of displaying a slide show of images received from the USB and wireless LAN circuitry. For example, when a digital camera containing JPEG images is connected to the USB port of the LG 55QNED85A and a user selects the USB port as the input source, in response to an operation by the user for conducting a slide show (e.g., selection of slide show functionality) via a remote controller, the LG 55QNED85A transmits a signal to the digital camera via the USB port causing it to output compressed image information corresponding to first still pictures, receives the compressed image information output from the digital camera via the USB port, decodes the received compressed image information by the central processor or comparable hardware or software, and conducts a slide show at predetermined time intervals. This is shown in the screenshots below from the LG 55QNED85A.









173. In addition, for example, when the digital camera containing JPEG images is connected wirelessly via the wireless LAN interface circuitry of the LG 55QNED85A based on a user input in the input device, in response to an operation by the user for conducting a slide show, the LG 55QNED85A transmits a signal to the digital camera via the wireless LAN interface circuitry causing it to output compressed images, receives the compressed images from the digital camera via the wireless LAN interface circuitry, decodes the received compressed image information by the central processor or comparable hardware or software, and conducts a slide show at predetermined time intervals. This is shown in the screenshots below from the LG 55QNED85A.











174.    The foregoing features and capabilities of the LG 55QNED85A, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claims 1-4, and 6 of the '780 Patent, under 35 U.S.C. § 271(a).

175.    On information and belief, Defendant further infringes the '780 Patent through additional products utilizing the same or reasonably similar functionalities as described above with respect to the LG 55QNED85A (collectively, "the '780 Accused Products"). On information and belief, the '780 Accused Products include, for example, LGE's OLED Series televisions including 55G6, 65G6, 77G6, 83G6, 97G6, 42C6, 48C6, 55C6, 65C6, 77C6H, 83C6H, 55B6, 65B6, 77M5, 55G5, 65G5, 77G5, 83G5, 97G5, 42C5, 48C5, 55C5, 65C5, 77C5, 83C5, 48B5, 55B5, 65B5,

77B5, 83B5, 55G4, 65G4, 77G4, 83G4, 97G4, 42C4, 48C4, 55C4, 65C4, 77C4, 83C4, 48B4, 55B4, 65B4, 77B4, 83B4, 77M3, 83M3, 97M3, 55G3, 65G3, 77G3, 83G3, 42C3, 48C3, 55C3, 65C3, 77C3, 83C3, 55B3, 65B3, 77B3, 55G2, 65G2, 77G2, 83G2, 97G2, 42C2, 48C2, 65C2, 77C2, 83C2, 55B2, 65B2, 77B2, 55G1, 65G1, 77G1, 48C1, 65C1, 77C1, 55B1, 65B1, 77B1, and 77T4; QNED Mini LED Series televisions including 55QNED90B, 65QNED90B, 75QNED90B, 86QNED90B, 115QNED90B, 65QNED9M, 75QNED9M, 55QNED85A, 65QNED85A, 75QNED85A, 86QNED85A, 100QNED85A, 50QNED85T, 98QNED85T, 75QNED99T, 86QNED99T, 55QNED85T, 65QNED85T, 75QNED85T, 86QNED85T, 65QNED90T, 75QNED90T, 86QNED90T, 75QNED99, 86QNED99, 43QNED82A, 50QNED82A, 55QNED82A, 65QNED82A, 75QNED82A, 86QNED82A, 65QNED92A, 75QNED92A, 85QNED92A, 43QNED70A, 50QNED70A, 55QNED70A, 65QNED70A, 75QNED70A, 86QNED70A, 43QNED75, 50QNED75, 55QNED75, 65QNED75, 75QNED75, 65QNED85TAA, and 75QNED85TAA; NanoCell Series televisions including 65NANO99, 75NANO99, 86NANO99, 65NANO95, 75NANO95, 55NANO90, 65NANO90, 75NANO90, 86NANO90, 49NANO85, 55NANO85, 65NANO85, and 75NANO85;   LGE televisions including OLED77T4PUA, 98UT9000PUA, 43UA77, 50UA77, 55UA77, 65UA77, 75UA77, 86UA77, 50UT7570PUB, 55UT7570PUB, 65UT7570PUB, 43UA7100, 55UA7100, 75UA7100, 43UT8000, 50UT8000, 55UT8000, 65UT8000, 70UT8000, 75UT8000, 43UA7000, 50UA7000, 55UA7000, 75UA7000, 43UQ7590, 70UQ7590, 75UQ7590, 86UQ7590, 43UA75, 50UA75, 55UA75, 65UA75, 75UA75, 86UA75, 50UQ7070ZUE, 55UQ7070ZUE, 65UQ7070ZUE, 43UR9000, 50UR9000, 55UR9000, 65UR9000, and 75UR9000.

176.    For example, each of these products is also equipped with a slideshow functionality, allowing it to communicate with a digital camera using both USB and wireless LAN interface

circuitry to receive and decode compressed image information and conduct a slideshow at predetermined intervals. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '780 Accused Products are identified to describe Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

177.    Defendant has indirectly infringed at least claims 1-4, and 6 of the '780 Patent in this District and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the '780 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '780 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides or websites, such as those located at: https://www.lg.com/us/support/product/lg-55QNED85AUA.AUS. Defendant is thereby liable for infringement of the '780 Patent pursuant to 35 U.S.C. § 271 (b).

178.    Defendant has indirectly infringed at least claims 1-4, and 6 of the '780 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '780 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '780 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

179. For example, the '780 Accused Products include a USB port and wireless LAN interface circuitry for receiving images from an external image apparatus such as a digital camera for conducting a slide show at predetermined time intervals. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '780 Patent pursuant to 35 U.S.C. § 271(c).

180. Defendant has been on notice of the '780 Patent since at the latest, July 19, 2021. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1-4, and 6 of the '780 Patent.

181. Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '780 Patent, which has been duly issued by the USPTO, and is presumed valid. Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '780 Patent, nor could it reasonably, subjectively believe that the patent is invalid. For example, since at least July 19, 2021, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '780 Patent, and that the '780 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '780 Patent, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's

knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '780 Patent.

182.   Maxell has been damaged by Defendant's infringement of the '780 Patent.

### COUNT 7 – INFRINGEMENT OF U.S. PATENT NO. 9,924,124

183.   Maxell incorporates paragraphs 1-182 above by reference.

184.   U.S. Patent No. 9,924,124 (the "'124 Patent," attached hereto at Exhibit 7) duly issued on March 20, 2018, and is entitled *Video Display Apparatus and Terminal Apparatus.*

185.   Maxell is the owner by assignment of the '124 Patent and possesses all rights under the '124 Patent, including the exclusive right to recover for past and future infringement.

186.   The '124 Patent is valid, enforceable, and was duly issued in full compliance with Title 35 of the United States Code after a full and fair examination, and enjoys a statutory presumption of validity under 35 U.S.C. § 282.

187.   Like other validity issues, a patent is presumed eligible under 35 U.S.C. §101, and can only be found ineligible by clear and convincing evidence. The '124 Patent is patentable under 35 U.S.C. § 101. It is not directed to an abstract idea. It provides specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components, such that it does not preempt the technological field.

188.   The claims of the '124 Patent are not directed to an abstract idea and are not limited to technology that is well-understood, routine, or conventional. Rather, the claimed inventions include inventive components that improve upon the function and operation of preexisting video display systems and methods.

189.    The '124 Patent is directed to video display apparatuses and methods of changing the displayed content where casting of such content utilizes two different types of bi-directional wireless communications. '124 Patent at Abstract. Prior to the priority date of the '124 Patent, viewing of content from different wireless devices was not possible using casting in a seamless and user-friendly video display apparatus, and without user interaction. *Id*. at 2:3-33. The prior art did not take into consideration the case where multiple users respectively view different contents on the same video display apparatus, nor did it provide a solution for seamlessly switching between content selected by different wireless devices using different communication pathways. *Id*. The '124 Patent solved this problem by including specific means of operation and communication between two different wireless devices using distinct communication pathways—one via a router and one without going via a router.

190.    More specifically, the '124 Patent is directed to casting to a TV from two different wireless devices: one via a router and one without going via a router. '124 Patent at Claim 1. For example, the claims of the '124 Patent recite devices and methods that execute two types of bi-directional wireless communication—first bi-directional wireless communication with a first wireless terminal device without going via a router and second bi-directional wireless communication via a router with a second wireless terminal device that is different from the first. *Id*. The terminal apparatus has a wireless communication function, and can transmit and receive various types of information to and from an Internet network, and has a function of performing the control of the video display apparatus in a remote place. *Id*. at 4:41-54. The LAN communication unit may directly transmit and receive the command and the status information to and from the terminal apparatus without the wireless router or the like by using, for example, infrared rays, Wi-Fi Direct, or Bluetooth. *Id*. at 6:45-49.

191.     If a first command for changing a video content on the display from a first video content selected with the first wireless terminal device to a second video content is transmitted from the second wireless terminal device via the router during displaying the first video content, the display unit terminates displaying the first video content and starts to display the second video content and the communication unit sends first information for informing termination of the displaying of the first video content to the first wireless terminal device without going via a router. '124 Patent at Claim 1. If a second command for changing a video content on the display from a second video content selected by the second wireless terminal device to another video content is transmitted from the remote controller, the display terminates displaying the second video content and starts to display another video content and the communication unit sends second information for informing termination of the displaying of the second video content via the router to the second wireless terminal device. *Id*.

192.     The asserted claims of the '124 Patent recite an improved video display apparatus with specific means of controlling the display video state according to distinct action-triggering information acquired and received from different wireless devices through different communication pathways. *Id*. at Claim 1. The video display apparatus is an apparatus that receives and displays a video content, and can receive, for example, a television signal by wireless or by wire from a broadcast station and display a video content based on the television signal. *Id*. at 4:59-65. Also, the video display apparatus can display a video content received from a network via a wireless router, for example, an Internet content of a URL specified by the user or the like. *Id*. at 4:60-65. The claimed commands sent by the wireless terminal devices are specific action-triggering information that controls operation of the display in a specific manner, enabling seamless content switching between devices using different communication pathways.

193.    Prior to the priority date of the '124 Patent, video display systems could not be controlled by multiple wireless devices using different communication pathways in a seamless and coordinated manner. The specification expressly states that prior systems did not take into consideration the case where multiple users respectively view different contents. *Id*. at 2:8-33. The asserted claims of the '124 Patent brought an improved solution to these systems by the use of distinct bi-directional communication pathways—one direct (without router) and one via router— to control the video display apparatus and manage content switching between different wireless devices seamlessly. This results in the smooth, uninterrupted, and seamless control of video content switching on a video display apparatus from multiple different wireless devices using different communication protocols.

194.    The claims of the '124 Patent are not directed to an abstract idea. Rather, they provide specific technical solutions to specific technical problems, achieving technical improvements to the relevant existing technology through unconventional combinations of specific, unconventional components. The claim elements are not well-understood, routine, or conventional—they are specific configurations of hardware and software that allow a video display apparatus to seamlessly manage bi-directional communications with multiple different wireless devices through different pathways, automatically switching content display in response to commands from different devices and sending termination notifications back through the appropriate communication pathway. '124 Patent at Claim 1. These capabilities were not previously available and represent a marked technical improvement to the functionality of video display systems.

195.    The components of the '124 Patent are not generic or conventional. For example, the '124 Patent discloses a direct communication unit that executes bi-directional communication

directly with a first wireless terminal device without going via a router, a network communication unit that executes bi-directional communication via a router with a second wireless terminal device, and a controller that controls these units in coordination. *Id.* at Claim 1. Further, when viewed as a whole, the claimed elements work together in a specific, non-conventional manner to achieve functionality not present in routine or generic computer implementations. The following features, for example, go beyond conventional computer operations: (1) seamless bi-directional communication with a first wireless device without going via a router; (2) seamless bi-directional communication via a router with a second wireless device different from the first; (3) automatic content switching in response to commands from different devices through different communication pathways; and (4) coordinated transmission of termination notifications back to the appropriate wireless device through the same communication pathway used by that device. *Id.* at Claim 1; 6:55-8:6, Figs. 4, 6-10. This ordered combination reflects a departure from well-understood, routine, and conventional techniques and therefore constitutes an unconventional inventive concept.

196. These features produce specific, tangible technical benefits: seamless content switching between multiple wireless devices, coordinated notification of content termination through appropriate communication pathways, user-friendly operation, and prevention of content from being missed when another user switches channels. *Id.* at 10:14-23, 14:44-54. These concrete improvements distinguish the claims from abstract ideas lacking such technological benefits. By the foregoing configuration, when the channel of the video display apparatus set by the remote control from a terminal apparatus is switched by another terminal apparatus, a content displayed on the video display apparatus prior to the switching is displayed on the terminal apparatus, and

even if a channel set by a user is switched by another user, the user can view the channel by using the terminal apparatus at hand without any particular operation. *Id*. at 10:14-23.

197. The '124 Patent family has also been cited by LGE (e.g., EP3550825A4), Rovi Guides, Inc. (e.g., US20160378276A1), Sharp NEC Display Solutions, Ltd. (e.g., JP7150989B2), and others. The patents (and entities) citing the '124 Patent family recognize that the '124 Patent was directed to technical improvement in wireless communication with video display apparatuses.

198. Defendant has directly infringed one or more claims of the '124 Patent in this District and elsewhere in Texas, including at least claim 1 literally and/or under the doctrine of equivalents, by or through making, using, importing, offering for sale and/or selling its televisions, including by way of example the LG 55QNED85A.

199. The LG 55QNED85A is a smart television that can connect to an antenna to display contents acquired via the television broadcast and can connect to the internet through its wireless adapter to display contents via the internet. The LG 55QNED85A has a remote control receiver that can receive infrared signals from a physical remote controller to control the television. The screenshots below of the LG 55QNED85A show content acquired via the internet.



200.    The LG 55QNED85A is equipped with a mirroring functionality, allowing it to communicate directly with a wireless terminal such as a smartphone, for example via Wi-Fi Direct, Miracast, screen mirroring and/or Wi-Fi Display. In the example below, the TV has a bi-directional communication with the smartphone without going via a router. The screenshots below demonstrate the LG 55QNED85A connected to the internet but the first smartphone (first wireless terminal device or "Smartphone A") not connected to any networks. A Miracast, Screen Mirroring and/or Wi-Fi Display connection is then directly established between LG 55QNED85A and the first smartphone (first wireless terminal device or "Smartphone A"), wherein the first video content from the first smartphone (first wireless terminal device or "Smartphone A") is displayed on the LG 55QNED85A. The first video content casted from Smartphone A via Miracast, Screen

Mirroring and/or Wi-Fi Display connection is displayed on the LG 55QNED85A and the user prepares for sending a first command for changing a video content on the display from a first video content to another content by, for example, DIAL or other multicast-based protocols.

201.    In the example below, the LG 55QNED85A is equipped with network interface circuitry allowing it to communicate with other devices on the same network, such as Wi-Fi-enabled smartphone devices. This communication via a router may occur, for example, via the DIAL or other multicast-based protocols. For example, when a second smartphone (second wireless terminal device or "Smartphone B") that is connected to the same network as the LG 55QNED85A TV, it establishes a connection with the LG 55QNED85A via a router using a network protocol such as, for example the DIAL or other multicast-based protocols, displaying of the first video content is terminated, and the second video content selected with the second smartphone (second wireless terminal device or "Smartphone B") starts displaying on the LG 55QNED85A. During this process, the LG 55QNED85A sends a termination notification to Smartphone A. The Smartphone B (second wireless terminal device) is an example of the second wireless terminal device which is different from Smartphone A (first wireless terminal device). The user sends a first command for changing video content on a display:



Smartphone A



Smartphone B





202.    In addition, when a user operates the remote controller to change the video content displayed from the second video content to another video content, displaying of the second video content is terminated, and the video content selected by the remote controller starts displaying on the LG 55QNED85A. During this process, the LG 55QNED85A sends a termination notification to Smartphone B.

203.    This is shown in the screenshots below of the LG 55QNED85A. The second video content selected by Smartphone B is displaying on the display screen of the LG 55QNED85A and the user prepares for sending a second command for changing a video content on the display from a second video content to another video content by using the remote controller. The status screen

109

on Smartphone B shows that casting of the second video content from Smartphone B was disconnected.









204.   The foregoing features and capabilities of the LG 55QNED85A, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, reflect Defendant's direct infringement by satisfying every element of at least claim 1 of the '124 Patent, under 35 U.S.C. § 271(a).

205.   On information and belief, Defendant further infringes the '124 Patent through additional products utilizing the same or reasonably similar functionalities as described above with respect to the LG 55QNED85A (collectively, "the '124 Accused Products"). On information and belief, the '124 Accused Products include, for example, LGE's OLED Series televisions including 55G6, 65G6, 77G6, 83G6, 97G6, 42C6, 48C6, 55C6, 65C6, 77C6H, 83C6H, 55B6, 65B6, 77M5, 55G5, 65G5, 77G5, 83G5, 97G5, 42C5, 48C5, 55C5, 65C5, 77C5, 83C5, 48B5, 55B5, 65B5, 77B5, 83B5, 55G4, 65G4, 77G4, 83G4, 97G4, 42C4, 48C4, 55C4, 65C4, 77C4, 83C4, 48B4,

113

55B4, 65B4, 77B4, 83B4, 77M3, 83M3, 97M3, 55G3, 65G3, 77G3, 83G3, 42C3, 48C3, 55C3, 65C3, 77C3, 83C3, 55B3, 65B3, 77B3, 55G2, 65G2, 77G2, 83G2, 97G2, 42C2, 48C2, 65C2, 77C2, 83C2, 55B2, 65B2, 77B2, 55G1, 65G1, 77G1, 48C1, 65C1, 77C1, 55B1, 65B1, 77B1, and 77T4; QNED Mini LED Series televisions including 55QNED90B, 65QNED90B, 75QNED90B, 86QNED90B, 115QNED90B, 65QNED9M, 75QNED9M, 55QNED85A, 65QNED85A, 75QNED85A, 86QNED85A, 100QNED85A, 50QNED85T, 98QNED85T, 75QNED99T, 86QNED99T, 55QNED85T, 65QNED85T, 75QNED85T, 86QNED85T, 65QNED90T, 75QNED90T, 86QNED90T, 75QNED99, 86QNED99, 43QNED82A, 50QNED82A, 55QNED82A, 65QNED82A, 75QNED82A, 86QNED82A, 65QNED92A, 75QNED92A, 85QNED92A, 43QNED70A, 50QNED70A, 55QNED70A, 65QNED70A, 75QNED70A, 86QNED70A, 43QNED75, 50QNED75, 55QNED75, 65QNED75, 75QNED75, 65QNED85TAA, and 75QNED85TAA; NanoCell Series televisions including 65NANO99, 75NANO99, 86NANO99, 65NANO95, 75NANO95, 55NANO90, 65NANO90, 75NANO90, 86NANO90, 49NANO85, 55NANO85, 65NANO85, and 75NANO85;  LGE televisions including OLED77T4PUA, 98UT9000PUA, 43UA77, 50UA77, 55UA77, 65UA77, 75UA77, 86UA77, 50UT7570PUB, 55UT7570PUB, 65UT7570PUB, 43UA7100, 55UA7100, 75UA7100, 43UT8000, 50UT8000, 55UT8000, 65UT8000, 70UT8000, 75UT8000, 43UA7000, 50UA7000, 55UA7000, 75UA7000, 43UQ7590, 70UQ7590, 75UQ7590, 86UQ7590, 43UA75, 50UA75, 55UA75, 65UA75, 75UA75, 86UA75, 50UQ7070ZUE, 55UQ7070ZUE, 65UQ7070ZUE, 43UR9000, 50UR9000, 55UR9000, 65UR9000, and 75UR9000. For example, each of these products is also equipped with a mirroring functionality, allowing it to communicate directly with a wireless terminal such as a smartphone and with a network interface allowing it to communicate with other devices on the same network, such as WiFi-enabled smartphone devices to receive and

114

display video content. Maxell reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '124 Accused Products are identified to describe Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

206.    Defendant has indirectly infringed at least claim 1 of the '124 Patent in this District and elsewhere in the United States by, among other things, and including through the actions of wholly-owned subsidiaries, actively inducing the use, offering for sale, selling, or importation of at least the '124 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '124 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides or websites, such as those located at: https://www.lg.com/us/support/product/lg-55QNED85AUA.AUS. Defendant is thereby liable for infringement of the '124 Patent pursuant to 35 U.S.C. § 271 (b).

207.    Defendant has indirectly infringed at least claim 1 of the '124 Patent, by, among other things, and including through the actions of wholly-owned subsidiaries, contributing to the direct infringement of others, including customers of the '124 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '124 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

115

208.    For example, the '124 Accused Products include a mirroring functionality, allowing it to communicate directly with a wireless terminal and a network interface allowing it to communicate with other devices on the same network to receive and display video content. These are components of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such components are a material part of the invention and upon information and belief are not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '124 Patent pursuant to 35 U.S.C. § 271(c).

209.    Defendant has been on notice of the '124 Patent since at the latest, July 19, 2021. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claim 1 of the '124 Patent.

210.    Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '124 Patent, which has been duly issued by the USPTO, and is presumed valid. Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '124 Patent, nor could it reasonably, subjectively believe that the patent is invalid. For example, since at least July 19, 2021, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '124 Patent, and that the '124 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '124 Patent, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, and based on Defendant's

knowledge of the strength and value of Maxell's portfolio due to the prior licensing and negotiation history set forth in this complaint, Defendant willfully infringes the '124 Patent.

211. Maxell has been damaged by Defendant's infringement of the '124 Patent.

## PRAYER FOR RELIEF

WHEREFORE, Maxell prays for relief as follows:

212. A judgment declaring that LGE has infringed and is infringing one or more claims of the '007, '020, '793, '206, '971, '780 and '124 Patents;

213. A judgment awarding Maxell compensatory damages as a result of LGE's infringement of one or more claims of the '007, '020, '793, '206, '971, '780 and '124 Patents, together with interest and costs, consistent with lost profits and in no event less than a reasonable royalty;

214. A judgment awarding Maxell treble damages and pre-judgment interest under 35 U.S.C. § 284 as a result of LGE's willful and deliberate infringement of one or more claims of the '007, '020, '793, '206, '971, '780 and '124 Patents;

215. A judgment declaring that this case is exceptional and awarding Maxell its expenses, costs, and attorneys' fees in accordance with 35 U.S.C. §§ 284 and 285 and Rule 54(d) of the Federal Rules of Civil Procedure;

216. A grant of preliminary and permanent injunctions enjoining LGE from further acts of infringement of one or more claims of the '007, '020, '793, '206, '971, '780 and '124 Patents; and

217. Such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Maxell hereby demands a trial by jury.

117

Dated: April 1, 2026

By: /s/ *Geoff Culbertson*

Kelly B. Tidwell (TX Bar No. 20020580)
Geoffrey P. Culbertson (TX Bar No. 24045732)
PATTON, TIDWELL & CULBERTSON, L.L.P.
2800 Texas Boulevard
Post Office Box: 5398
Texarkana, Texas 75503
Telephone: (903) 792-7080
Facsimile: (903) 792-8233
kbt@texarkanalaw.com
gpc@texarkanalaw.com


Kfir B. Levy (Lead Counsel)
Jamie B. Beaber
Michael L. Lindinger
Alan Grimaldi
Julia Haines
Tatsuya Koyama
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Telephone: (202) 263-3000
Facsimile: (202) 263-3300
klevy@mayerbrown.com
jbeaber@mayerbrown.com
mlindinger@mayerbrown.com
agrimaldi@mayerbrown.com
jhaines@mayerbrown.com
tatsuya.koyama@mayerbrown.com


Amanda Streff Bonner
DongWook "Daniel"  Kim
Nicholas Ciulla
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
(312) 782-0600
asbonner@mayerbrown.com
dkim@mayerbrown.com
nciulla@mayerbrown.com

*Counsel for Plaintiff Maxell, Ltd.*

118